



## OPINION

No. 04-07-00369-CV

**MEDISTAR CORPORATION**,
Appellant/Cross-Appellee

v.

Dr. David R. **SCHMIDT**,
Appellee/Cross-Appellant

and

Sports Medicine Associates of San Antonio, P.A., Sports SA Holdings, L.P., Sports SA, LLC,
Don Lowell Ryan, Charles Syms III, M.D., and Christopher Pederson, M.D.,
Appellees

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2004-CI-18715
Honorable Peter Sakai, Judge Presiding

Opinion by:    Catherine Stone, Justice

Sitting:       Alma L. López, Chief Justice
               Catherine Stone, Justice
               Sandee Bryan Marion, Justice

Delivered and Filed:   June 25, 2008

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART

Medistar Corporation ("Medistar") filed suit against Dr. David R. Schmidt, Sports Medicine

Associates of San Antonio, P.A., Sports SA Holdings, L.P., Sports SA, LLC, Don Lowell Ryan,

Charles Syms III, M.D., and Christopher Pederson, M.D. (collectively "the Physicians"), alleging

fraud, breach of contract, and other causes of action. Medistar's allegations stem from a development project in which Medistar was to develop a medical facility for the Physicians. Medistar claims to have spent more than $1 million and devoted thousands of man-hours to developing the medical facility before the Physicians excluded Medistar from the project.

The threshold issue in this case is whether a proposal letter for the development and construction of the medical facility which stated that it was a "preliminary proposal . . . for discussion only" and which attached "very preliminary financial information" was unambiguously non-binding as a matter of law, or whether it presented a jury question regarding the parties' intent to be bound. The trial court determined there was no fact issue and granted summary judgment against Medistar on its breach of contract claim, and the case proceeded to jury trial on various remaining claims. The jury found in favor of Medistar on its promissory estoppel claim against Dr. Schmidt, and the trial court entered judgment for Medistar against Dr. Schmidt for $418,069.63 in damages, plus $408,412.00 in attorney's fees. Although the jury made several additional liability findings against Dr. Schmidt and Dr. Schmidt's co-defendant Ryan, the jury awarded zero damages to Medistar for such claims. Both Medistar and Dr. Schmidt appeal the trial court's final judgment.

After thoroughly considering the issues presented, the trial court's judgment is affirmed in part and reversed and rendered in part. The trial court's judgment is affirmed to the extent that it awards Medistar $418,069.63 in damages on its promissory estoppel claim against Dr. Schmidt. However, the trial court's judgment is reversed to the extent that it awards Medistar its attorney's fees and judgment is rendered that Medistar recover no attorney's fees from Dr. Schmidt.

**BACKGROUND**

Medistar is a real estate development company that specializes in the development of medical facilities. Dr. Schmidt, a team physician for the San Antonio Spurs basketball team, developed the idea to build a state-of-the-art integrated medical plaza ("IMP") adjacent to the training facility Medistar had recently constructed for the Spurs. Dr. Schmidt referred to the IMP as "The Texas Center for Athletes," and wanted Medistar to develop the project for him.

Dr. Schmidt, along with the physicians he was then affiliated with from Orthopedic Surgery Associates of San Antonio, consulted with Medistar in 2000 about developing the Texas Center for Athletes project. Dr. Schmidt and his affiliates urged Medistar to purchase the real property for the IMP project from HealthSouth, the owner of the property adjacent to the Spurs's training facility, and to develop the IMP on their behalf. Medistar began negotiations with HealthSouth for the real property for the IMP project, but was unable to consummate a deal for the property.

In July 2003, Dr. Schmidt's affiliates advised Medistar that they were no longer interested in pursuing the IMP with Medistar. Dr. Schmidt, however, assured Medistar that he still planned to move forward with the project. In January 2004, Dr. Schmidt compiled a new group of physicians, Sports Medicine Associates of San Antonio, P.A. ("SMA"), to proceed with the IMP project with Medistar. Subsequently, on March 26, 2004, Medistar sent Dr. Schmidt and his new associates a preliminary proposal for the development of the Texas Center for Athletes. This letter outlined the responsibilities Medistar would undertake with respect to developing the IMP. The letter provided that Medistar would: acquire the real property adjacent to the Spurs's training facility from HealthSouth; develop the IMP; obtain all necessary permits, approvals, and loans; and assume full financial responsibility for the project. The letter also set forth the ownership interests Medistar designated for all those involved with the IMP project. Dr. Schmidt, on behalf of the Texas Center

for Athletes and the SMA physicians, signed the preliminary proposal letter from Medistar on March 30, 2004, and returned a copy of the document to Medistar. Having received a signed copy of the letter from Dr. Schmidt, Medistar initiated steps to secure the real property for the IMP from HealthSouth.

After signing Medistar's proposal letter, Dr. Schmidt proceeded to organize a group of investors, comprised mostly of physicians, to form Sports SA Holdings, L.P. Dr. Schmidt formed this entity to own and operate the Texas Center for Athletes and to secure the real property for the IMP from HealthSouth. Once Sports SA Holdings was organized, it began negotiations and entered into a contract with HealthSouth to purchase the property adjacent to the Spurs's training facility on July 12, 2004. Medistar, which had been attempting to secure the real property for the IMP from HealthSouth for Dr. Schmidt and his affiliates, did not interfere with Sports SA Holdings's pursuit of the real property even though Medistar had indicated that it would secure the real property from HealthSouth in its March 26, 2004 proposal letter.

Once Sports SA Holdings purchased the real property for the IMP from HealthSouth, Medistar sent several letters to Dr. Schmidt and his associates regarding its future involvement in the Texas Center for Athletes. Medistar offered several proposals for its involvement, but each was rejected by Dr. Schmidt and his associates, who determined that Medistar would no longer have any role in the IMP project. Sports SA Holdings subsequently entered into an agreement with another developer, who was given no ownership rights in the IMP project, to develop the Texas Center for Athletes.

Medistar filed suit against the Physicians for fraud, breach of contract, breach of partnership, civil conspiracy, promissory estoppel, and other causes of action. The Physicians moved for summary judgment on both traditional and no evidence grounds. The trial court granted the

Physicians a partial summary judgment in their favor and dismissed Medistar's breach of contract, ratification, breach of fiduciary duty, and negligence claims.

Medistar's remaining claims were tried to a jury. After a 21-day trial, the jury made liability findings against Dr. Schmidt on Medistar's breach of partnership, promissory estoppel, fraud, and civil conspiracy claims. Although the jury made several liability findings against Dr. Schmidt, it awarded Medistar damages only on its promissory estoppel claim against him. The jury found that Medistar suffered damages totaling $418,069.63 in relation to this claim. The jury also made liability findings against Ryan on Medistar's fraud and civil conspiracy claims, but awarded Medistar zero damages for such claims. The jury made no liability findings against any of the other defendants.[1] Finally, the jury determined the reasonable fee for the necessary services of Medistar's attorneys was $408,412.00.

Based on the jury's findings, the trial court rendered judgment in favor of Medistar for $418,069.63 in damages, $408,412.00 in attorney's fees, and pre-judgment and post-judgment interest. Both Medistar and Dr. Schmidt each filed motions for new trial and motions for judgment notwithstanding the verdict, which were denied by the trial court after several hearings. Both Medistar and Dr. Schmidt appeal the trial court's judgment.

---

[1] The jury made no liability findings against the other defendants even though the jury found that Dr. Schmidt acted as their agent in the transactions with Medistar.

**MEDISTAR'S APPEAL**

In its appeal, Medistar argues: (1) the trial court erred in granting the Physicians' no evidence and traditional motions for summary judgment on its breach of contract claim; (2) the trial court erred by failing to submit a breach of contract question to the jury; (3) the trial court erred by denying its motion for new trial based upon bailiff and juror misconduct; (4) the trial court erred by refusing to reconcile the jury's conflicting findings on the issues of agency and damages; and (5) the jury's zero damages finding on the issues of fraud, conspiracy, and breach of partnership was against the great weight and preponderance of the evidence. We are unpersuaded by Medistar's contentions and overrule each of its appellate complaints.

*A.*      *The Physicians' Motions for Summary Judgment*

Medistar contends the trial court erred in granting the Physicians' no evidence and traditional motions for summary judgment on Medistar's breach of contract claim. Medistar asserts that none of the grounds raised in the Physicians' motions justified the trial court granting summary judgment in their favor.

The standards for review of traditional and no evidence summary judgments are well settled. We review a trial court's summary judgment *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156-57 (Tex. 2004). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); TEX. R. CIV. P. 166a(c). "A movant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim." *Grant*, 73 S.W.3d at 215. "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Joe*, 145 S.W.3d at 157.

This court will affirm the trial court's summary judgment if any of the theories presented to the court and preserved for appellate review are meritorious. *Id.*

A no evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. TEX. R. CIV. P. 166a(I). A no evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* at 751 (citation omitted).

The record shows the Physicians moved for summary judgment on the ground that the parties did not have a binding, enforceable contract for the development of the IMP. According to the Physicians, the March 26, 2004 letter Medistar purports to be the parties' written contract for the development of the IMP is not an enforceable contract because the parties never intended to be bound by the terms of this particular letter. The Physicians rely on language within the letter stating its content was "preliminary" in nature and "for discussion only" to support their position.

The intent of the parties to be bound is an essential term of an enforceable contract. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988); *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.). The parties' intent is often a question of fact. *Foreca*, 758 S.W.2d at 746; *Dault*, 2 S.W.3d at 380. However, where the parties' intent is clear and unambiguous on the face of the instrument, it may be determined as a matter of law. *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 16 (Tex. App.—Houston [1st Dist.] 2000, pet. denied);

*Hardman*, 2 S.W.3d at 380. If the instrument is unambiguous, ordinarily the writing alone will be deemed to express the presence or absence of intent to be bound. *S & A Marinas, Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 769 (Tex. App.—Austin 1994, writ denied). Only if the instrument is capable of multiple meanings and thus is ambiguous, is there a fact issue rendering summary judgment inappropriate. *Id.*

We believe the trial court properly granted summary judgment in favor of the Physicians on Medistar's breach of contract claim because no fact issue was raised on the issue of whether the parties intended to be bound by the terms of the March 2004 letter. The parties' intent not to be bound by the terms of the March 26, 2004 letter is clear from the face of the document itself. The March 2004 letter plainly states in bold print that its content is "Preliminary — For Discussion Only." Moreover, the letter includes the following statements: "this is Medistar's preliminary proposal for your review"; "we are also attaching very preliminary financial information"; and "we look forward to further discussions with you to refine our proposal according to the needs and goals of the Physicians." Finally, Medistar attached pro formas to the letter that all include the qualification of being "Preliminary — For Discussion and Budget Purposes Only." The language within the March 2004 letter conclusively establishes that the parties had no intent to be immediately bound by the terms set forth in the letter. *See generally John Wood Group*, 26 S.W.3d at 20 (holding letter agreement's statement that it was "not binding" except for certain provisions, conclusively established that the parties did not intend to be bound as a matter of law). Accordingly, we hold the trial court properly granted summary judgment for the Physicians on Medistar's breach of contract claim because the March 2004 letter did not constitute a binding, enforceable contract for the development of the IMP. Having determined that at least one of the grounds presented in the Physicians' motion for summary judgment is meritorious, we need not address Medistar's challenge

to the Physicians' alternate ground for summary judgment. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993) ("When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious.").[2]

## B.      *Breach of Contract Jury Question*

Medistar also argues the trial court erred by failing to submit a breach of contract question to the jury. Medistar alleges the parties tried the breach of contract issue by consent given the amount of evidence that was admitted during trial concerning the breach of contract issue without any objection from the Physicians. Medistar therefore claims that it was entitled to have a breach of contract question submitted to the jury.

Notwithstanding the fact that the trial court had already granted summary judgment in favor of the Physicians on the breach of contract issue, the record shows Medistar never tendered or submitted a request to the court for a breach of contract jury question. Our procedural rules state that a party must submit a request when it has the burden of proof and the court omits a particular question. *See* TEX. R. CIV. P. 278 (stating that a failure to submit a question, definition, or instruction shall not be deemed a ground for reversal unless a substantially correct question, definition, or instruction has been requested); *see also Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 201 (Tex. App.—Texarkana 2000, pet. denied) (holding the appellants failed to

---

[2] In an effort to create a fact issue concerning the parties' intent, Medistar directs us to various excerpts from the Physicians' deposition and trial testimony in which the Physicians purportedly acknowledge that the March 2004 letter constituted a binding agreement. However, we need not consider such evidence on appeal due to the unambiguous nature of the March 2004 letter. *See S & A Marinas*, 875 S.W.2d at 769 (noting "ordinarily the writing alone will be deemed to express the presence or absence of intent to be bound").

We also note that Medistar argues that Schmidt's signature on the March 26, 2004 proposal letter elevates the letter into a binding contract. Schmidt's signature, however, does not change the fact that the letter clearly contemplates future negotiations by the parties. Because the March 2004 reflects that the parties contemplated additional negotiations before the parties would become bound to each other, we are unpersuaded by Medistar's argument.

preserve error for appeal where they did not tender to the trial court any proposed jury question, definition, or instruction regarding the issue of negligence per se). Because Medistar failed to submit any jury question on the breach of contract issue, it waived its complaint.

## C.     *Motion for New Trial Based on Juror and Bailiff Misconduct*

Medistar claims the trial court erred by denying its motion for new trial based upon bailiff and juror misconduct. Medistar's motion for new trial alleged jurors engaged in misconduct by ignoring the court's instructions and agreeing to let any ten votes determine the answers to the issues. Medistar's motion also alleged that juror misconduct occurred when juror Barbara Poettgen convinced several other jurors that Medistar's Chief Executive Officer, Monzer Hourani, was a litigious litigant who did not deserve any damages. Finally, Medistar's motion alleged the district court bailiff improperly communicated with jurors during their deliberations.

We review a trial court's ruling on a motion for new trial under an abuse of discretion standard. *Chavarria v. Valley Transit Co.*, 75 S.W.3d 107, 110 (Tex. App.—San Antonio 2002, no pet.). "'A trial court abuses its discretion when it acts unreasonably or without regard for any guiding legal principles.'" *Id.* (citation omitted).

To obtain a new trial on the ground of juror or bailiff misconduct, the movant must establish that: (1) the misconduct occurred; (2) it was material; and (3) it probably caused injury. TEX. R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000); *Pharo v. Chambers County, Tex.*, 922 S.W.2d 945, 950 (Tex. 1996). Certain types of evidence are inadmissible to prove juror misconduct in a motion for new trial. *Chavarria*, 75 S.W.3d at 110. "Both the Texas Rules of Civil Procedure and Rules of Evidence prohibit a juror from testifying as to any matter or statement occurring during the course of the jury's deliberations." *Id.*; *see* TEX. R.

CIV. P. 327(b)[3]; TEX. R. EVID. 606(b).[4] "The term 'deliberations' means formal deliberations—when the jury weighs the evidence to arrive at a verdict." *Chavarria*, 75 S.W.3d at 110. "Whether misconduct occurred and caused injury is a question of fact for the trial court." *Golden Eagle Archery*, 24 S.W.3d at 372. Absent findings by the trial court to the contrary, we must assume that the court made all findings in support of its decision to deny the motion for new trial. *Id.*

Medistar asserts the trial court erred in denying its motion for new trial because the jury engaged in misconduct by ignoring the court's instructions and agreeing to let any ten votes determine the answers to the issues. As a result of the jurors' voting agreement, Medistar maintains it was prejudiced because the verdict was reached by ten affirmative votes of different jurors from issue to issue.

The record shows that after the presiding juror announced its verdict to the court, the jury was individually polled at Medistar's request. The trial court asked the jury if the answers it provided were to be taken as their verdict and all jurors replied affirmatively. Following the polling of the jury, the trial court held a brief ex parte meeting with the jury off of the record and then discharged the jurors from service. Approximately one week later, Medistar was told by one of the

[3] Rule 327(b) provides: "A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

[4] Rule 606(b) provides: "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve."

jurors that the presiding juror advised the trial court during the ex parte meeting that the verdict was not an unanimous verdict despite all of the jurors assenting to the verdict in open court.[5]

At the evidentiary hearing on Medistar's motion for new trial, it was urged that the verdict was not unanimous because it was reached by ten affirmative votes of different jurors from issue to issue. Medistar elicited testimony from eleven of the twelve jurors from the trial at the hearing. All of the jurors testified that once the court had charged them, they reached an understanding to let any ten votes determine the answers to the issues as each was taken up and voted upon.[6] Each juror further indicated that he or she adhered to the voting agreement during deliberations to reach a verdict. We have serious concerns that the testimony elicited by Medistar at the new trial hearing regarding the juror's voting procedure impermissibly delves into the jury's deliberations or thought processes. *See generally Moody v. EMC Servs., Inc.*, 828 S.W.2d 237, 243 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (recognizing the trial court properly excluded juror's testimony on the jury's improper voting procedure because such testimony concerned the jury's deliberations and not an outside influence). However, even if we assume the jurors' testimony was properly received, we cannot say Medistar has demonstrated that injury probably resulted from the jurors' conduct.

"'To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he 'would otherwise have done on one or more issues vital to the judgment.'" *Pharo*, 922 S.W.2d at 950 (citations omitted). The record

---

[5]The testimony at the motion for new trial hearing does not address Medistar's claim that the trial court was informed of the voting agreement during the court's ex parte meeting with the jury. While we recognize the wide latitude trial courts are granted in conducting trials, this case illustrates the problems that can arise when generally open proceedings are conducted ex parte.

[6] The jurors reached this agreement despite the court charging the jury as follows: "You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict." The jurors' disregard of this instruction is indeed unsettling, but the question is whether the jurors' conduct produced reversible error under Texas law.

shows that when questioned about the verdict at the new trial hearing, each juror testified that he or she accepted the verdict as his or her verdict upon the conclusion of the deliberation process and that he or she still recognized the verdict as his or her verdict today. Because nothing in the record shows that the alleged misconduct likely caused a juror to vote differently than he or she would otherwise have done, we conclude the record does not support Medistar's contention that it was injured as a result of the juror's voting procedure.

Medistar also asserts the trial court erred in denying its motion for new trial because juror Poettgen improperly convinced several of the other jurors that Hourani, Medistar's CEO, was a litigious litigant who did not deserve any damages given his prior involvement in two other lawsuits. At the motion for new trial hearing, however, each of the jurors questioned about this particular issue denied ever having had a conversation about Hourani and his litigation history. The trial court, as fact finder and sole judge of the witnesses' credibility, was compelled to believe the jurors' testimony that they never conversed about Hourani. *See Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex. App.—San Antonio 1999, pet. denied) ("'The trial court serves as fact finder at a hearing on a motion for a new trial and, accordingly, is the sole judge of the witnesses' credibility.'"). Because we must defer to the trial court's credibility findings with respect to this issue, we must conclude Medistar has failed to demonstrate that this instance of juror misconduct ever occurred.

Finally, Medistar argues the trial court erred in denying its motion for new trial because of the bailiff's alleged misconduct in communicating with the jurors during their deliberations. *See* TEX. R. CIV. P. 283 (prohibiting bailiffs from communicating with jurors except to inquire if they have agreed on a verdict and to make other communications as ordered by the court). Medistar contends that when jurors were deadlocked "7 to 5," the district court bailiff improperly told jurors: (1) they would not be paid their fee if they had to return on another day to continue their

deliberations as a result of their being deadlocked; and (2) if they remained deadlocked, they would have to wait another week to continue their deliberations since the trial court planned to close the court the following week for spring break vacation.

Even if we were to assume the bailiff's comments to the jurors were made and were improper, we cannot conclude that it reasonably appears from the record that injury probably resulted to Medistar from the bailiff's conduct. Medistar did not produce any evidence at the motion for new trial hearing regarding the impact of the bailiff's communications on the jurors. Thus, we are left to speculate as to whether the bailiff's comments actually caused a juror to vote differently than he or she would otherwise have done absent the comments. We must therefore conclude the record does not support Medistar's contention that it was injured as a result of the bailiff's misconduct.

### D. *Conflicting Jury Findings*

Medistar argues that the jury made numerous conflicting findings relating to the issues of agency and damages.[7] Medistar did not raise any contention concerning the conflicting nature of the jury's findings before the jury was discharged. Because Medistar did not raise any contention concerning the conflicting jury findings before the jury was discharged, such complaints are not preserved for our review. *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 861 (Tex. App.—Fort Worth 2003, pet. denied) (holding that to preserve error, appellant must object to conflict in jury findings before the jury is discharged); *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 245 (Tex. App.—San Antonio 1996, writ denied) (same).

### E. *Damages*

---

[7] Medistar complained about the contradictory nature of the jury's answers by way of post-trial motion, including a motion to reconcile and conform the jury's verdict, as well as a motion for JNOV.

Lastly, Medistar asserts the jury's zero damages finding on the issues of fraud, conspiracy, and breach of partnership was against the great weight and preponderance of the evidence because the jury wholly ignored the testimony of its experts on the issue of damages. In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence in support of and contrary to the finding, and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The trier of fact is afforded considerable discretion in evaluating opinion testimony on the issue of damages. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). "Unless the subject matter is solely for experts, jurors are capable of forming their own opinions from the record as a whole." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 339 (Tex. 1998). Thus, "expert testimony on damages is only evidentiary and non-binding upon the trier of fact." *Gainsco County Mutual Ins. Co. v. Martinez*, 27 S.W.3d 97, 108 (Tex. App.—San Antonio 2000, pet. dism'd by agr.).

Medistar claims the jury heard evidence from several expert witnesses that it incurred between $8 million and $10 million in damages as a result of Schmidt's conduct regarding the development of the IMP. Medistar contends its damages estimate is both conservative and reasonable, and claims the jury could not ignore its experts' opinions. The jury, however, was entitled to reject the opinion testimony on the issue of damages, regardless of whether it was from an expert or a lay witness. *Martinez*, 977 S.W.2d at 339. The jury chose not to credit Medistar's opinion testimony with respect to the damages it purportedly suffered, and we must defer to such finding on appeal. Accordingly, we cannot say the jury's determination that Medistar incurred zero damages from Schmidt's conduct is against the great weight and preponderance of the evidence.

**DR. SCHMIDT'S CROSS-APPEAL**

In his cross-appeal, Dr. Schmidt argues: (1) Medistar's suit is barred by limitations; (2) Medistar's promissory estoppel claim was submitted to the jury in error because promissory estoppel can only be used defensively and may not be asserted by a plaintiff as an affirmative ground for relief; (3) the trial court erred in submitting a jury question on a promissory estoppel theory of recovery because the promises that Medistar seeks to enforce are unenforceable under the statute of frauds; (4) there is legally insufficient evidence to support the jury's award of $418,069.63 in promissory estoppel damages to Medistar; and (5) the trial court erred in awarding Medistar its attorney's fees since Medistar recovered zero damages from him on its breach of partnership claim. We are persuaded by Dr. Schmidt's complaint concerning the trial court's award of attorney's fees to Medistar; therefore, we sustain Dr. Schmidt's attorney's fees issue. As for Dr. Schmidt's remaining contentions, they are overruled.

*A.     Limitations*

Dr. Schmidt argues Medistar's suit is time barred. Limitations is an affirmative defense, and the burden is on the defendant to "plead, prove, and secure findings to sustain its plea of limitations." *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988); *see* TEX. R. CIV. P. 94. Because Dr. Schmidt did not secure findings to sustain his plea of limitations, he has waived the defense.

*B.     Promissory Estoppel as a Cause of Action*

Next, Dr. Schmidt argues Medistar's promissory estoppel claim was submitted to the jury in error because promissory estoppel can only be used defensively and may not be asserted by a plaintiff as an affirmative ground for relief. Although promissory estoppel is normally a defensive theory, it may nonetheless be asserted by a plaintiff as an affirmative ground for relief. *Kelly v. Rio*

*Grande Computerland Group*, 128 S.W.3d 759, 769 (Tex. App.—El Paso 2004, no pet.); *MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 774 (Tex. App.—Fort Worth 2003, pet. denied); *Frost Crushed Stone Co. v. Odell Geer Const. Co.*, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.); *Reyna v. First Nat'l Bank*, 55 S.W.3d 58, 70 n.4 (Tex. App.—2001, no pet.); *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 166 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Bailey v. City of Austin*, 972 S.W.2d 180, 193 (Tex. App.—Austin 1998, pet. denied); *see generally Traco, Inc. v. Arrow Glass Co.*, 814 S.W.2d 186, 189 (Tex. App.—San Antonio 1991, writ denied) (concluding "promissory estoppel is a viable cause of action in bid construction cases"); *but see Stanley v. Citifinancial Mortgage Co.*, 121 S.W.3d 811, 820 (Tex. App.—Beaumont 2003, pet. denied); *Robbins v. Payne*, 55 S.W.3d 740, 747 (Tex. App.—Amarillo 2001, pet. denied).

### C.    *Statute of Frauds*

Dr. Schmidt further argues the trial court erred in submitting a jury question on a promissory estoppel theory of recovery because the promises that Medistar seeks to enforce are unenforceable under the statute of frauds. The statute of frauds, however, is not a defense to an action for affirmative relief under the doctrine of promissory estoppel. *See Frost Crushed Stone*, 110 S.W.3d at 46; *see also* 14 William V. Dorsaneo III, Texas Litigation Guide § 210A.06[6] (2007) ("The statute of frauds is not a defense to an action for affirmative relief under the doctrine of promissory estoppel based on the premise that the plaintiff detrimentally relied on the defendant's oral promise.").

### D.    *Promissory Estoppel Damages*

Dr. Schmidt also argues the evidence is legally insufficient to support the jury's damages award on Medistar's promissory estoppel claim. In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if

reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). Evidence is legally insufficient when: (a) there is a complete absence of evidence of a vital fact; (b) the trial court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove that fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

"Damages recoverable in a case of promissory estoppel are not the profits that the promisee expected, but only the amount necessary to restore him to the position in which he would have been had he not relied on the promise." *Frost Crushed Stone*, 110 S.W.3d at 47. Here, the jury was presented with evidence that Medistar spent more than $1 million and devoted thousands of man-hours to developing the IMP project for Dr. Schmidt and his associates. The record shows Medistar incurred expenses on the IMP project from 2000, the date when the first representations were made to it concerning the company's involvement in the Texas Center for Athletes, until 2004, the date when it was permanently excluded from the development project. The record shows Medistar incurred some of the following expenses during its involvement with the IMP project: $988,865.25 for personnel costs; $19,700.00 for legal expenses; $4,260.70 on marketing; $12,744.94 for travel and entertainment; $944.27 for telephone services; and $602.70 for delivery services. The jury's total damages award ($418,069.63) is significantly less than the amount of damages for which evidence was presented at trial; therefore, we cannot say there is legally insufficient evidence to support the jury's damages finding.

**E.      *Attorney's Fees***

Lastly, Dr. Schmidt contends the trial court erred in awarding Medistar its attorney's fees. A prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999). A party who prevails on a breach of partnership claim is entitled to recover attorney's fees for prosecution of the claim as provided by section 38.001(8) of the Texas Civil Practice and Remedies Code: "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997); *see also Tex. Nom Ltd. P'ships v. Akuna Matata Invs., Ltd.*, No. 04-04-00447-CV, 2005 WL 159459, *6 (Tex. App.—San Antonio 2005, pet. denied) (mem. op.) (recognizing section 38.001(8) applies to breach of partnership claims); *Atterbury v. Brison*, 871 S.W.2d 824, 828 (Tex. App.—Texarkana 1994, writ denied) (same). The supreme court has acknowledged that section 38.001 requires the recovery of damages for a claimant to be eligible to recover attorney's fees. The court has expressly stated that for a party to recover attorney's fees under section 38.001, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *see Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam) (concluding party "was not entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim."). We review the trial court's decision to award attorney's fees *de novo*. *Gereb v. Smith-Jaye*, 70 S.W.3d 272, 273 (Tex. App.—San Antonio 2002, no pet.).

In this case, the submission of attorney's fees to the jury was predicated upon an affirmative finding by the jury that Dr. Schmidt had breached his partnership agreement with Medistar

concerning the development of the Texas Center for Athletes.[8]  Although the jury found that Dr. Schmidt committed a breach of his partnership agreement with Medistar when he excluded the company from the IMP development project, the jury awarded Medistar zero damages for the breach.  Because Medistar failed to recover damages on its breach of partnership claim, it could not recover its attorney's fees under section 38.001.  *See Green Int'l*, 951 S.W.2d at 390.  The trial court therefore erred when it allowed Medistar to recover $408,412.00 for its attorney's fees.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed in part and reversed and rendered in part.  We affirm the trial court's judgment to the extent that it awards Medistar $418,069.63 in damages on its promissory estoppel claim against Dr. Schmidt.  However, the trial court's judgment is reversed to the extent that it awards Medistar its attorney's fees and judgment is rendered that Medistar recover no attorney's fees from Dr. Schmidt.

Catherine Stone, Justice

---

[8] Question 12 of the court's charge instructed the jury as follows: "If you answered 'Yes' to any part of [the breach of partnership question,] then answer the following question . . . . What is a reasonable fee for the necessary services of Medistar's attorneys in this case, stated in dollars and cents?"